IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

ANTHONY P. HEARD, JR,

                         Plaintiff,                    OPINION and ORDER

            v.                                         09-cv-96-bbc

PETER HUIBREGTSE, MATTHEW SCULLION,
MOLLI ROLLI, SCOTT RUBIN-ASCH
and STACY HOEM,[1]

                         Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In this lawsuit brought pursuant to 42 U.S.C. § 1983, plaintiff Anthony Heard, Jr.
contends that defendants Peter Huibregtse, Matthew Scullion, Molli Rolli, Scott Rubin-Asch
and Stacy Hoem violated his rights under the Eighth Amendment by failing to provide him
adequate mental health treatment and failing to prevent him from harming himself.  Now
before the court is defendants' motion for summary judgment, dkt. #31, to which plaintiff
has not responded.  Because plaintiff has not responded in any way to defendants' motion
or proposed findings of fact, defendants' proposed findings of fact must be taken as
undisputed.  Procedure to be Followed on Motions for Summary Judgment, II.A, II.B and
II.C and Memorandum to Pro Se Litigants Regarding Summary Judgment Motions, attached
to Preliminary Pretrial Conference Order (Aug. 21, 2009), dkt. #26.  With no evidence to

---

[1]  Defendants' names have been amended to reflect their correct spelling.

support a conclusion that defendants violated plaintiff's rights under the Eighth Amendment, I will grant their motion for summary judgment. Fed. R. Civ. P. 56 (summary judgment appropriate where "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law.")

From defendants' proposed findings of fact, I find the following facts to be material and undisputed.

UNDISPUTED FACTS

Plaintiff Anthony Heard is a prison inmate at the Wisconsin Secure Program Facility (WSPF), a maximum-security institution in Boscobel, Wisconsin.  Defendant Molli Rolli, M.D., is the psychiatry director for the Wisconsin Department of Corrections and is responsible for oversight of psychiatric care within the Department of Corrections.  The other defendants are employed at WSPF.  Defendant Scott Rubin-Asch, Ph.D., is the psychologist supervisor, defendant Stacy Hoem, Ph.D., is a psychologist, defendant Peter Huibregtse is the warden and defendant Matthew Scullion is a correctional officer.

In April 2008, plaintiff was housed at the Green Bay Correctional Institution in Green Bay, Wisconsin and had exhibited a pattern of assaultive and dangerous behavior. Because of such behavior, the security director at the Green Bay Correctional Institution referred plaintiff for placement at WSPF, which offers psychiatric and psychological services to inmates with mental health needs.  However, inmates with *severe* mental illness may not

be housed at WSPF.  Thus, before an inmate is transferred to WSPF, a psychologist screens the inmate to determine whether he has a serious mental illness.

On August 12, 2008, Dr. Robert Marcellino conducted a mental health screening to determine whether plaintiff could be transferred to WSPF.  As part of the screening, Dr. Marcellino reviewed plaintiff's psychological services file, psychological services progress reports and psychiatry progress notes.  He also reviewed "offender in observation forms" and conducted interviews with housing unit staff.  Dr. Marcellino noted that plaintiff did not have a history of suicide attempts, but had received treatment for depression, anger and aggressive behavior in the past and had been prescribed several psychotropic medications before he was incarcerated in Wisconsin.   Dr. Marcellino noted that plaintiff had complained of "depressed and irritable moods, feelings of loneliness, occasional thoughts of suicide, . . . angry impulses, insomnia, low appetite, and poor concentration" since being incarcerated.  Plaintiff had been on clinical observation multiple times at the Green Bay Correctional Institution.  After reviewing this history with plaintiff, Dr. Marcellino noted:

> In the present interview Mr. Heard was in agreement with the above Mental Health History, except to say he has never had any thoughts of suicide.  He acknowledged that he does experience depressed and irritable moods, feelings of loneliness, angry impulses, insomnia, low appetite, and poor concentration. In explaining his frequent observation placements he said it never has had to do with wanting to die, but rather, "I just get bored."  He said he would like to go to WSPF for a "change of scenery."

Dr. Marcellino made a diagnosis of depressive disorder NOS ("not otherwise specified") and antisocial personality disorder.  Dr. Marcellino concluded that plaintiff "is not severely

3

mentally ill," "has expressed a desire to go to WSPF" and that there was "no clinical contraindication to transfer to WSPF."

Dr. Robert McQueeney, a psychiatrist from the Department of Corrections health services unit, reviewed the mental health screen completed by Dr. Marcellino. Dr. McQueeney noted that plaintiff had a history of mood disorder, with anger being the main complaint. Dr. McQueeney concluded that plaintiff was a stable person with antisocial personality disorder.

As the psychiatry director for the Wisconsin Department of Corrections, defendant Dr. Rolli is responsible for reviewing an inmate's mental health screening and determining whether it would be appropriate to transfer the inmate to WSPF. On September 10, 2008, defendant Rolli reviewed Dr. Marcellino's and Dr. McQueeney's evaluation of plaintiff and concluded that plaintiff qualified for transfer to WSPF because he did not suffer from a serious mental illness.

On September 15, 2008, plaintiff was transferred to WSPF. During the intake process, WSPF staff learned that plaintiff had been taking clonidine for about one month to treat depression, and that he had taken seroquel, wellbutrin and trileptal in the past to treat depression and anger. The intake screening also indicated that plaintiff had been hospitalized and treated for psychological problems in Illinois. Plaintiff denied thinking about hurting or killing himself "recently" and denied feeling depressed, sad or nervous. He did not report any problems eating, sleeping, hearing voices or seeing visions, but admitted

4

that he had problems getting along with staff and other inmates and that he was "always getting into fights."  Plaintiff was given a diagnosis of "MH-1," indicating that he had a mental health need but was not seriously mentally ill.  Because of his prescription for psychotropic medication, he was placed on clinical monitoring and referred to psychiatry for a follow-up appointment.

On September 24, 2008, plaintiff submitted a psychological services request form, stating that he could not sleep at night, he was having nightmares, he was scared, he was seeing his uncle hurting him and the walls were closing on him.  Dr. Knuppel, a psychiatrist at WSPF, met with plaintiff on September 25, 2008.  Plaintiff complained to Knuppel about sleeping problems and stated that the clonidine he was taking for depression was not working as well as it had initially.  However, plaintiff denied thoughts of suicide or homicide. Plaintiff also told Knuppel that he did not belong at WSPF because of his mental health problems.  He told Knuppel to obtain his mental health records from the Illinois Department of Children and Family Services.  Knuppel made a diagnosis of mood disorder and antisocial personality disorder, concluding that plaintiff was psychiatrically stable and showed no evidence of any major mental illness.  He thought that a higher dose of clonidine might ameliorate plaintiff's symptoms.  Plaintiff agreed to try an increased dose of clonidine and Knuppel scheduled a follow-up appointment.

Knuppel saw plaintiff again on October 23, 2008.  During this visit, Knuppel and plaintiff agreed that plaintiff should continue taking clonidine despite the mild side effects

5

he was experiencing.  Knuppel made the same diagnoses of mood disorder and antisocial personality disorder.  Knuppel did not believe plaintiff was at risk of self harm.

On October 29, 2008, defendant Scullion was responsible for checking on inmates in clinical observation every 15 minutes.   At 7:15 p.m., Scullion checked on plaintiff and saw him talking to staff.  At 7:30, Scullion checked on plaintiff again.  This time, plaintiff was banging his head on the cell door and threatening the staff member.  As a correctional officer, Scullion is required to report inmate incidents to his supervisor, who makes decisions about what actions, if any, should be taken.  When Scullion saw plaintiff banging his head against the cell wall, he notified Captain Gilberg and Sergeant Lee immediately.  At 7:45 p.m., plaintiff was still banging his head on the door and said "I am going to get my chance to get y'all.  I am going to slip my cuffs and smash your heads into the wall."  After every bang, plaintiff yelled and clinched his fists.  Scullion saw that plaintiff had developed a bump on his forehead that was starting to bleed and that there was blood on the cell window and wall.  Scullion is trained as a medical first responder and did not believe that plaintiff was in any immediate danger.  However, he told Captain Gilberg and Sergeant Lee about plaintiff's behavior again.  At approximately 8:20 p.m., a nurse came to see plaintiff.  There was no indication that plaintiff suffered head trauma as a result of the head banging.

On October 30, 2008, a psychological services staff member saw plaintiff.  Staff noted that plaintiff appeared in good spirits, was smiling and was interactive throughout the assessment.  When asked about the previous day's incident, plaintiff stated that he was upset

6

because of problems he was having with a correctional officer. He denied feeling suicidal and reported that he would try to utilize better coping mechanisms when encountering frustrating circumstances in the future.

During numerous visits with psychological services staff at WSPF, plaintiff has complained repeatedly that he does not belong at WSPF because of his mental health problems. He has also sent multiple information requests to the psychological services unit stating that he should be exempt from WSPF and that staff at WSPF is not aware of his mental health history. Defendants Hoem and Rubin-Asch have responded to these complaints, telling plaintiff that he was evaluated and approved for transfer to WSPF by defendant Rolli. For example, on September 22, 2008, plaintiff submitted a psychological service request form stating that he did not understand why he was at WSPF "with [his] medical history" and that he had a diagnosis of schizophrenia and "plenty other mental illnesses." Defendant Hoem responded, stating that the psychological service unit had no record of any diagnosis of serious mental illness and that plaintiff had been clinically cleared by the Department of Corrections mental health director for placement at the WSPF. Hoem scheduled an individual appointment with plaintiff to discuss his concerns.

Plaintiff sent similar information request forms on November 13, November 20, November 23 and November 24, 2008, asking why he did not undergo a mental health screening or evaluation before his transfer to WSPF and stating that his mental illnesses should exempt him from being at WSPF. Also, plaintiff wrote to the Secretary of the

Department of Corrections regarding his "well documented" and "extensive" history of mental illness.  In his letter, plaintiff asked that his mental health issues be addressed, listed a number of mental health diagnoses which he believed he had been given in the past, described a "history of self harm," alleged that he was not evaluated before transfer to the WSPF and said he was a "threat to himself."  Defendant Dr. Rolli responded to the letter, noting that before plaintiff's transfer he had been evaluated by Dr. Marcellino and it had been determined that transfer to WSPF was appropriate.  She also told plaintiff that she would notify the psychological services unit at WSPF regarding plaintiff's belief that he was a "threat" to himself and not safe at WSPF.  Rolli called psychological services staff at WSPF and asked them to meet with plaintiff regarding his concerns.  When psychological service staff met with plaintiff regarding the letter, plaintiff said he did not feel suicidal, but that he felt unsafe because of a specific WSPF officer with whom he had problems.  He also told staff that he should be exempt from WSPF.

Because plaintiff continued to report mental health problems and complain about being incarcerated at WSPF, psychological service unit staff decided to perform additional assessments on plaintiff to determine whether he should remain at WSPF or whether he was struggling with serious mental health symptoms that warranted his transfer out of this facility.  Defendant Hoem met with plaintiff on November 21, 2008 and administered the Structured Interview of Reported Symptoms.  This interview was developed to assess "systematically deliberate distortions in the self-report of psychological symptoms."  Plaintiff

8

endorsed a high number of symptoms and psychological problems.  However, his scores on the interview corresponded to a 100% likelihood of malingering.  The results of the test led Hoem to conclude that plaintiff was fabricating a mental disorder.

Hoem also administered the Minnesota Multiphase Personality Inventory-2 test to plaintiff.  This test is an actuarial personality inventory designed to assess the presence of psychological and emotional difficulties by comparing an individual's responses to various clinical groups.  Hoem concluded that plaintiff's behavior during the evaluation suggested that plaintiff was exaggerating obvious symptoms of mental illness and that plaintiff's ongoing placement at WSPF was "not clinically contraindicated."

Hoem conducted further psychological testing of plaintiff on November 27, 2008 to evaluate plaintiff's mental state.  Hoem believed the testing indicated that plaintiff was exaggerating or fabricating symptoms of psychiatric illness.  Defendant Dr. Rubin-Asch, reviewed the evaluations and concluded that plaintiff's placement at WSPF was appropriate.

On December 5, 2008, Hoem met with plaintiff again.  Plaintiff said his mood was "okay," though he was frustrated at not being able to reach his family and expressed feelings of anger and disappointment with his mother related to his childhood.  He denied any thoughts of self-harm. Defendant Hoem diagnosed plaintiff with malingering and antisocial personality disorder, noting that plaintiff's presentation was sincere but also manipulative and "potentially contrived."  Hoem provided plaintiff with supportive psychotherapy and

9

placed him on clinical monitoring.  Under clinical monitoring, plaintiff was seen by psychological services staff multiple times every week.

On December 20, 2008, plaintiff submitted a psychological services request form, stating that he needed help, could not sleep, was "blanking out," banging on walls and "rocking in the corner."  Hoem responded, telling plaintiff that he was being seen multiple times each week by the psychological services unit and that he should utilize the materials that psychological services had provided to him.

On December 23, 2008 at approximately 9:05 a.m., plaintiff told staff that he took 12 tablets of clonidine and 25 tablets of naproxen.  He was taken to the hospital.  Following this incident, Dr. Knuppel discontinued plaintiff's clonidine prescription.  Plaintiff was also placed on sharps restriction, meaning that he could not possess or use sharp items.

On December 23, 2008, Captain Mason and Officer Grover observed plaintiff ingest what they believed was medication, but they could not determine the quantity or type.  They asked him whether he was suicidal, but he refused to answer.  He told the psychological services technician to retrieve his journal in which he had made numerous references to "dying" and "killing himself."  He was transported to the hospital for further evaluation.  At the hospital, plaintiff did not appear to be in distress.  He was alert, oriented and smiled intermittently throughout the assessment.  When he returned to WSPF, he was placed on clinical observation status.  Plaintiff would not say whether he had thoughts of self-harm.

10

Plaintiff met with Dr. Knuppel on December 30, 2008.  During this visit, plaintiff told Knuppel about the overdose and said that WSPF staff was not treating his mental health problems.  During the visit, Knuppel reviewed plaintiff's psychological history.  Noting plaintiff's complaints of explosive temper and impulsiveness and his previous history of mood disorder, Knuppel recommended that plaintiff try divalproex.  Knuppel gave plaintiff a diagnosis of mood disorder, impulse-control disorder and antisocial personality disorder and concluded that plaintiff's risk of self-harm was low.

In February 2009, plaintiff complained that the divalproex was not effective and was causing dizziness.  Despite Knuppel's recommendation to the contrary, plaintiff stopped taking the divalproex and asked Knuppel for a different medication.  For the first time, plaintiff also complained that he was hearing voices.  In particular, plaintiff stated that he sometimes spoke with his deceased father.  Knuppel concluded that this was not indicative of psychosis or other major mental illness.  Knuppel continued plaintiff's diagnosis of mood disorder and antisocial personality disorder.  Because plaintiff would not take the divalproex, Knuppel started plaintiff on lithium.  However, plaintiff stopped taking lithium on March 5, 2009 after experiencing dizziness and exhaustion.

On May 8, 2009, plaintiff reported thoughts of self-harm and refused to engage in assessment with psychological services unit staff.  Staff placed him on sharps restriction and observation status to insure his safety.  Plaintiff met with Dr. Knuppel on June 2, 2009.

11

Knuppel diagnosed mood disorder and antisocial personality disorder, increased plaintiff's lithium dosage and prescribed trazodone.

In addition to those instances already mentioned, plaintiff has requested and received psychological and psychiatric attention on several occasions while at WSPF. Defendant Hoem met with plaintiff on September 30, 2008, November 18, 2008, November 21, 2008, December 5, 2008, December 9, 2008, January 20, 2009 and January 27, 2009. Defendant Rubin-Asch met with plaintiff on December 26, 2008. Dr. Knuppel met with plaintiff on November 25, 2008, December 30, 2008, January 29, 2009 and February 26, 2009. Other psychological services unit staff met with plaintiff on September 30, 2008, November 5, 2008, November 11, 2008, November 13, 2008, November 24, 2008, December 1, 2008, December 9, 2008, December 10, 2008, December 23, 2008, December 26, 2008, January 20, 2009, February 17, 2009, March 23, 2009, March 24, 2009, March 25, 2009, April 9, 2009, April 14, 2009, April 20, 2009, April 28, 2009, May 7, 2009, May 8, 2009 and May 14, 2009.

Also, on multiple occasions from December 2008 through March 2009, plaintiff submitted information request forms to psychological services asking about his medical records, medications and mental health treatment. On each occasion, defendant Hoem, defendant Rubin-Asch or another member of the psychological service staff met with plaintiff or provided him a written response to his inquiries. At no time did any psychological service

staff member or psychiatrist at WSPF give plaintiff a diagnosis other than mood disorder, impulse-control disorder or antisocial personality disorder.


OPINION

Plaintiff was granted leave to proceed on his claim that defendants Huibregtse, Rolli, Rubin-Asch and Hoem failed to provide him mental health treatment in violation of the Eighth Amendment and that defendant Scullion failed to prevent plaintiff from engaging in acts of self-harm on October 29, 2008.


A.  Mental Health Treatment

The Eighth Amendment prohibits cruel and unusual punishment and requires the government to provide medical care to those being punished by incarceration.  Snipes v. DeTella, 95 F.3d 586, 590 (7th Cir. 1996) (citing Estelle v. Gamble, 429 U.S. 97, 103 (1976)).  A prison doctor or administrator violates a prisoner's right to medical care if the official is "deliberately indifferent" to a "serious medical need."  Estelle, 429 U.S. at 104-5; Gutierrez v. Peters, 111 F.3d 1364, 1369 (7th Cir. 1997).  Thus, to succeed on a claim of deliberate indifference, plaintiff must establish that he had an objectively serious medical need, that defendants were aware that he needed medical treatment and that defendants knowingly or recklessly disregarded the risk by failing to take reasonable measures to address it.  Forbes v. Edgar, 112 F.3d 262, 266 (7th Cir. 1997); Farmer v. Brennan, 511 U.S. 825, 847 (1994).  A

13

plaintiff cannot establish an Eighth Amendment claim by showing that a doctor made an incorrect diagnosis or provided improper treatment resulting from negligence or even gross negligence. <u>Gutierrez</u>, 111 U.S. at 1374; <u>Snipes</u>, 95 F.3d at 590.

A psychiatric or psychological disorder may present a "serious medical need." <u>Antonelli v. Sheahan</u>, 81 F.3d 1422, 1432 (7th Cir. 1996). For the purposes of this motion I will assume without deciding that the evidence is sufficient to demonstrate that plaintiff has a serious medical need. However, I conclude that a reasonable trier of fact could not find that any defendants have been deliberately indifferent to that need.

1.  <u>Defendants Hoem and Rubin-Asch</u>

It is undisputed that Hoem and Rubin-Asch provided medical treatment to plaintiff. When a doctor has provided a prisoner some treatment, the question is whether that treatment is constitutionally adequate. <u>Duckworth v. Ahmad</u>, 532 F.3d 675, 679 (7th Cir. 2008). To prove that it is not, a plaintiff must show that the doctor acted with such blatant inappropriateness as to imply that his actions or omissions were not actually based on medical judgment. <u>Id.</u> The Court of Appeals for the Seventh Circuit has explained that unless medical care evidences "intentional mistreatment likely to seriously aggravate the prisoner's condition," a prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim. <u>Snipes</u>, 95 F.3d at 592 (citations omitted).

14

Plaintiff has provided no factual basis for finding that defendant Hoem's or defendant Rubin-Asch's mental health care was blatantly inappropriate.  On multiple occasions since plaintiff arrived at WSPF, Hoem, Rubin-Asch, Knuppel and other staff in the psychological services unit met with plaintiff to discuss his mental health, evaluated him, offered psychological treatment and responded to plaintiff's questions and problems.  Further, defendants Hoem and Rubin-Asch administered several tests to plaintiff to determine whether he needed to be transferred out of WSPF because of severe mental health needs. The results of the test suggested that plaintiff was likely malingering and overstating symptoms of psychosis or severe mental illness.  Even so, Hoem and Rubin-Asch continued to meet with plaintiff and placed him on clinical observation status and sharps restrictions on multiple occasions to insure his safety.  Other than plaintiff's own broad assertions that he did not belong at WSPF and that his mental health needs were not being met, there is no evidence that Hoem or Rubin-Asch were treating plaintiff's needs improperly.  Although plaintiff is clearly dissatisfied with the diagnoses and treatment offered by the psychological services unit at WSPF, he has adduced no evidence to show that Hoem or Rubin-Asch used anything less than proper medical judgment in providing continual care and treatment to plaintiff at WSPF.

2. <u>Defendant Rolli</u>

The facts do not show that defendant Rolli knowingly or recklessly disregarded plaintiff's mental health needs. When Rolli approved plaintiff's transfer to WSPF, she relied on the clinical judgment of Dr. Marcellino, who had evaluated plaintiff and concluded that plaintiff had no serious mental illness. Since plaintiff has been at WSPF, Rolli has displayed concern for his well-being by instructing psychological service staff to address plaintiff's complaints and concerns. Each time that plaintiff has contacted Rolli, she has either responded personally to his questions or directed him to contact psychological service staff at WSPF. As the psychiatry director for the Department of Corrections, Rolli cannot evaluate every prisoner personally and must rely on the diagnoses and medical judgments of prison psychologists and psychiatrists. In this case, Rolli relied on the judgment and treatment decisions of Dr. Marcellino, defendant Hoem and defendant Rubin-Asch. No reasonable jury could find from these undisputed facts that Rolli's failure to do more amounted to deliberate indifference. <u>Johnson v. Snyder</u>, 444 F.3d 579, 586 (7th Cir. 2006) (affirming summary judgment for health administrator who relied on plaintiff's medical record and doctor's treatment decisions); <u>Johnson v. Doughty</u>, 433 F.3d 1001, 1015 (7th Cir. 2006) (affirming directed verdict for health care administrator who responded appropriately to inmate's complaints of worsening symptoms and relied reasonably on doctor's professional opinions).

3.  Defendant Huibregtse

Finally, a reasonable jury could not conclude that defendant Huibregtse was deliberately indifferent to plaintiff's mental health needs.  Huibregtse cannot be held liable for a constitutional violation based solely on his position as the warden of WSPF.  Instead, there must be evidence of his personal involvement in a constitutional violation.  Gentry v. Duckworth, 65 F.3d 555, 561 (7th Cir. 1995) (liability under § 1983 must be based on a defendant's personal involvement in constitutional violation).  There is no evidence in the record that defendant Huibregtse was aware that plaintiff was suffering from a serious medical need or that Huibregtse was deliberately indifferent to such need.

In sum, there is no evidence that any defendant consciously disregarded plaintiff's mental health needs.  Accordingly, defendants' motion for summary judgment will be granted with respect to plaintiff's claim that defendants failed to provide him adequate mental health care.


B.  Defendant Scullion

Plaintiff was also granted to leave to proceed on his claim that defendant Scullion disregarded a substantial risk that plaintiff would suffer serious harm from banging his head against the cell door on October 29, 2008.  Prison officials have a duty to protect prisoners from substantial risks of serious harm, even if the harm is self-inflicted.  Cavalieri v. Shepard, 321 F.3d 616, 622 (7th Cir. 2003) (prison officials have duty to protect inmates from

17

causing self-harm).  A prison official may violate a prisoner's Eighth Amendment rights by failing to act in ways that could help prevent serious harm.  <u>Farmer</u>, 511 U.S. at 842 ("it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm.")

As a correctional officer, Scullion is responsible for notifying a supervisor when there are safety problems.  On October 29, 2008 at 7:30 p.m., Scullion saw plaintiff banging his head.  Scullion did not believe that plaintiff was at risk of serious harm, but he immediately notified the unit sergeant that plaintiff was banging his head.  Plaintiff continued to bang his head, and Scullion notified the sergeant again.  A nurse came to see plaintiff at 8:20 p.m.

These facts do not establish an Eighth Amendment violation.  First, there is no evidence that Scullion subjectively believed that plaintiff was at a substantial risk of serious harm.  Second, even if Scullion did believe that there was a substantial risk that plaintiff would suffer serious harm, a reasonable jury could not conclude that Scullion consciously disregarded the risk.  As soon as Scullion saw plaintiff banging his head, he notified his supervisor.  It then became the sergeant's decision what action, if any, should be taken to address the situation.  Therefore, I will grant defendants' motion for summary judgment with respect to plaintiff's claim against defendant Scullion.

ORDER

IT IS ORDERED that the motion for summary judgment, dkt. #31, filed by defendants Peter Huibregtse, Molli Rolli, Scott Rubin-Asch, Stacy Hoem and Matthew Scullion is GRANTED.  The clerk of court is directed to enter judgment for defendants and close this case.

Entered this 27th day of May, 2010.

BY THE COURT:

/s/

BARBARA B. CRABB
District Judge